# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### September 12, 2006 Session

## STATE OF TENNESSEE v. LATISHA JONES

**Direct Appeal from the Criminal Court for Shelby County**
**No. 04-02523     James C. Beasley, Jr., Judge**

---

**No. W2005-02673-CCA-R3-CD  - Filed January 25, 2007**

---

Following a jury trial Defendant, Latisha Jones, was convicted of first degree felony murder and especially aggravated robbery, both Class A felonies.  Defendant was sentenced to life imprisonment for her felony murder conviction.  Following a sentencing hearing, the trial court sentenced Defendant as a Range I, standard offender, to twenty-three years for her especially aggravated robbery conviction and ordered her robbery sentence to be served consecutively to her sentence for felony murder.  Defendant does not challenge the length or manner of service of her sentence.  In her appeal, Defendant argues that (1) the evidence is insufficient to support her convictions; (2) the trial court erred in not suppressing her statement to the investigating officers; (3) the trial court erred in its instructions to the jury on facilitation; (4) the trial court erred in failing to instruct the jury on the lesser included offense of attempted especially aggravated robbery; and (5) Tennessee pattern instruction, criminal 43.04 is unconstitutional.  After a thorough review, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed

THOMAS T. WOODALL, J., delivered the opinion of the court, in which DAVID H. WELLES and JERRY L. SMITH, JJ., joined.

James E. Thomas, Memphis, Tennessee, (on appeal); and Reba Robinson, Memphis, Tennessee, (at trial), for the appellant, Latisha Jones.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; William L. Gibbons, District Attorney General; James Wax, Assistant District Attorney General; and Teresa McCusker, Assistant District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

## I. Background

Hope Crayton testified that she lived in the apartment across from Defendant's apartment, and she and Defendant were friends. Ms. Crayton said that she had seen the victim, Gregory Smith, twice while she was with Defendant. On June 28, 2003, Defendant asked Ms. Crayton to drive her over to the victim's house later that night, but Ms. Crayton said her car was not operable. Ms. Crayton said that Defendant told her that she, James Thacker, Delshaun Epps, and Kymetra Gates were going to rob the victim that night and needed a car to transport the heavier items. Defendant told Ms. Crayton that the victim was not giving her money as she had asked.

Ms. Crayton learned a few days later that the victim had died. She telephoned Defendant to tell her the news, and Defendant acted surprised. Ms. Crayton said that she next saw Defendant on July 4, 2003, and she asked Defendant if Defendant had really robbed the victim. Ms. Crayton had initially thought Defendant was joking when she said she and her friends were going to commit the offense. Defendant acknowledged that she had robbed the victim. Defendant told Ms. Crayton that she and Ms. Gates went to the victim's house on the night of the offense. At some point, Ms. Gates called Mr. Thacker and Mr. Epps on her cell phone. Defendant said she hit the victim on the head with a beer bottle and then Mr. Thacker and Mr. Epps entered the house. The two men tied the victim up and started hitting him, asking the victim where "the guns and the money" were located. Defendant told Ms. Crayton that she hit the victim on the knees and both sides of his neck with the claw part of a hammer. Defendant said that the group took "a bag load of stuff," including some televisions. Defendant told Ms. Crayton that she did not know if the victim was alive when she left.

On cross-examination, Ms. Crayton acknowledged that she did not see Defendant with any of the victim's property after the offense, although Ms. Crayton said that Mr. Thacker brought the victim's televisions to her house before he tried to sell them. Ms. Crayton acknowledged that she and Defendant had argued about Defendant's boyfriend a couple of weeks before the offense.

Timothy Burse, the victim's next door neighbor, was mowing his lawn on June 29, 2003, when he noticed that the side door to the victim's house was open. Mr. Burse called out the victim's name through the open door but did not receive a response. Mr. Burse told his mother to call the police.

Officer Marcus Tucker, with the Memphis Police Department, responded to the call about the victim. Officer Tucker said that he entered the victim's home through an open side door. Officer Tucker said that the home had been ransacked, and the victim was lying on the kitchen floor with a stocking or sock tied around his right leg. Officer Tucker verified that the victim was not breathing and called his supervisor.

Sergeant Nathan Berryman and Sergeant Mark Miller, with the Memphis Police Department, interviewed Defendant in connection with the charged offenses. Sergeant Berryman testified that

he read Defendant her *Miranda* rights and also advised Defendant that if she decided to answer questions without a lawyer, that she had the right to stop the interview at any point until she had spoken to a lawyer. Defendant waived her *Miranda* rights and gave a written statement. In her written statement, Defendant said that she and Ms. Gates went to the victim's house on June 28, 2003, because Ms. Gates "was going to sleep with [the victim] for money." Defendant introduced Ms. Gates to the victim and then left for about thirty or forty minutes. When Defendant returned to the victim's house, Ms. Gates told her to be quiet, and Defendant heard a noise. She found Mr. Epps and Mr. Thacker in the process of tying up the victim. Defendant hit the victim on the head with her beer bottle two times, but the bottle did not break. Ms. Gates "was going back and forth really fast, picking up things like she was in [a] supermarket sweep" and putting the items by the door. Mr. Epps then took the items outside. Defendant saw Mr. Thacker sitting on the victim, and she picked up a hammer and hit the victim on the kneecaps two or three times. Mr. Thacker took the hammer from her and struck the victim on several parts of his body, asking "where the money at, where the guns at."

Defendant said that she went to the side door and saw a man down the street dressed in dark clothes. Defendant told the others that they were being watched, and "everybody began to gather up what they were going to get and ran." Defendant said she grabbed two or three beers. The group returned to Defendant's apartment where Mr. Epps and Mr. Thacker discussed the division of the stolen property. Defendant left her apartment with a man she referred to as her "brother." Defendant said in her written statement that Ms. Gates told her the following night that the victim had been shot in the head. Defendant stated that she was scared because she thought that one of the group had gone back to the victim's house and shot the victim without telling her. Defendant said that when she left the victim "he was alive but still tied up, and talking and struggling [and] trying to say things." When asked why she struck the victim in the head with a beer bottle, Defendant responded, "To be honest I really had no reason for doing it. It's just like I saw what was going on in my surrounding at that time and acted stupidly on an impulse."

On cross-examination, Sergeant Berryman acknowledged that he never saw Defendant in possession of any of the victim's property. Sergeant Berryman said that he was not aware that Defendant's fingerprints were not found in the victim's house.

O'Brien Clarey Smith performed an autopsy on the victim on June 30, 2003. Dr. Smith testified that the victim's death was caused by multiple injuries to his body and head. Dr. Smith stated that the presence of patterned oval bruising was consistent with being struck by a round object. Patterned rectangular bruising separated by a clear space was consistent with being struck by the claw end of a hammer. Dr. Smith said that the victim's rib cage was crushed with nine ribs on each side of the rib cage showing fractures. A black sock was tied around the victim's right ankle, a belt was looped around his right wrist and a tee-shirt was knotted around his neck. No gunshot wound was present.

Dr. Smith testified that the principal wounds which contributed to the victim's death or made him vulnerable to death from the other injuries inflicted on his body were the crushing of the rib

cage, the use of a compressive force around his neck, and the blunt trauma force to his head. Dr. Smith said the victim had been dead for over twenty-four hours when the autopsy was performed on the morning of June 30, 2003. On cross-examination, Dr. Smith said the crushed rib cage was consistent with someone sitting on the victim's chest or squeezing his chest. Dr. Smith acknowledged that the blows to the victim's kneecaps did not contribute to the victim's death.

The State rested its case in chief, and Defendant testified on her own behalf. Defendant denied that she had talked to Ms. Crayton after the offenses were committed. Defendant testified that she was not in Memphis on July 4, 2003. Defendant said that she moved to Mississippi on June 30, 2003, after the lease on her Memphis apartment expired. Defendant said that she and Ms. Crayton had argued over Ms. Crayton flirting with Mr. Epps with whom Defendant was living at the time of the offenses. Ms. Crayton was also upset because Defendant had told Ms. Crayton's husband that Ms. Crayton was engaged in a sexual relationship with a friend of Defendant's.

Defendant said that she and Ms. Gates went to the victim's house on the evening of June 28, 2003, so that she could introduce Ms. Gates to the victim. Defendant said that Ms. Gates intended to engage in sexual intercourse with the victim in exchange for money. Defendant drank some beer with the victim and Ms. Gates and then left the apartment. Defendant went down the street where she drank some more beer and chatted with a friend. Defendant said she returned to the victim's house and found the door open. Ms. Gates met her in the living room, and Defendant heard noises coming from the back of the house. Defendant observed Mr. Epps, Mr. Thacker, and the victim wrestling with one another. Defendant said that nobody told her what was going on and described herself as "highly intoxicated." Defendant said she "just acted on impulse" in defending her friends. Defendant acknowledged that she struck the victim in the head and on both knees with a hammer she found on the floor. Defendant said that the hammer was not a "full, regular sized hammer." Defendant said Mr. Thacker grabbed the hammer from her and sat on the victim as he struck the victim with the hammer. Defendant said that during Mr. Thacker's assault of the victim, Mr. Epps gathered up some of the victim's possessions and put the items in a blanket. Defendant went to a side door and observed a man down the street watching them. Defendant said that she took some beers and left. Defendant testified that the victim was alive when she left. Defendant denied that she participated in tying up the victim

On cross-examination, Defendant acknowledged that neither Mr. Thacker nor Mr. Epps knew the victim, and although Ms. Gates knew who the victim was, she did not know him personally. Defendant acknowledged that she was the one to call the victim to arrange the meeting with Ms. Gates.

## II. Sufficiency of the Evidence

Defendant challenges the sufficiency of the convicting evidence, arguing that the blows she inflicted on the victim's head and kneecaps with a beer bottle and a hammer did not contribute to the victim's death.

In reviewing Defendant's challenge to the sufficiency of the convicting evidence, we must review the evidence in a light most favorable to the prosecution in determining whether a rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed.2d 560, 573 (1979). Once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Black*, 815 S.W.2d 166, 175 (Tenn.1991). The defendant has the burden of overcoming this presumption, and the State is entitled to the strongest legitimate view of the evidence along with all reasonable inferences which may be drawn from that evidence. *Id*.; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn.1982). The jury is presumed to have resolved all conflicts and drawn any reasonable inferences in favor of the State. *State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn.1984). Questions concerning the credibility of witnesses, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn.1997). These rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App 1990).

As relevant here, first degree felony murder is defined as "a killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery." T.C.A. § 39-13-202(a)(2). Especially aggravated robbery is a robbery committed with a deadly weapon where the victim suffers serious bodily injury. *Id*. § 39-13-403(a). A robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." *Id*. § 39-13-401(a).

The State proceeded at trial under a theory of criminal responsibility. "A person is criminally responsible for an offense committed by the conduct of another if . . . [a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, ar attempts to aid another person to commit the offense." *Id*. § 39-11-402(2).

Viewing the evidence in a light most favorable to the State, Ms. Crayton testified that Defendant, Ms. Gates, Mr. Epps and Mr. Thacker planned to rob the victim. Defendant, as the one who knew the victim, arranged a meeting on the night of the offense. As Mr. Thacker and Mr. Epps struggled with the victim, Defendant struck the victim over the head with a beer bottle. Defendant then retrieved a hammer from the floor and struck the victim over both kneecaps. Defendant observed Ms. Gates and Mr. Epps remove certain of the victim's possessions from the house. Defendant took some beers and left the victim's house with the others.

Presence and companionship with the perpetrators of a felony before and after the commission of the offense are circumstances from which one's participation in the crime may be inferred. *State v. Jones*, 15 S.W.3d 880, 890 (Tenn. Crim. App. 1999). No particular act need be shown. *Id*. It is not necessary for one to take a physical part in the crime; encouragement of the principal is sufficient. *Id*. (citing *State v. McBee*, 644 S.W.2d 425, 428 (Tenn. Crim. App. 1982). By its verdict, the jury accredited Ms. Crayton's testimony that Defendant was a participant in the plan to rob the victim, and Defendant conceded that she set up the meeting which culminated in the

-5-

victim's robbery and death. Although mere presence during the commission of a crime is not sufficient to support a finding that one is criminally responsible for the conduct of another, a rational trier of fact could find beyond a reasonable doubt based on the evidence presented that Defendant was an active participant in the victim's robbery and criminally responsible for the conduct which led to his death. Defendant is not entitled to relief on this issue.

## III. Motion to Suppress

On appeal, Defendant argues that the trial court erred in denying her motion to suppress her written statement on the basis that her "right to cut off questioning" was not "scrupulously honored" by the investigating officers after she invoked her constitutional right to remain silent. *See Michigan v. Mosley*, 423 U.S. 96, 96 S. Ct. 321, 46 L. Ed. 2d 313 (1975).

Defendant's motion to suppress, however, was based on her contention that her statement was taken in violation of her asserted Sixth Amendment right to have counsel present during the interrogation. Defendant asserted that "[a]ny written or verbal statements, admissions or confessions made to authorities on or around these dates were made only after persistent questioning by authorities in violation of her repeated and asserted right to counsel and her repeated requests for counsel."

At the suppression hearing, Sergeant Miller testified that Defendant's interview began at approximately 11:00 p.m. on September 8, 2003, when she arrived from Mississippi. The interview culminated in Defendant giving a written statement during the early morning hours of September 9, 2003. Sergeant Miller said that Defendant's three co-defendants had previously been arrested, and they had all given statements implicating Defendant in the charged offenses. Moreover, an independent witness had advised the investigating officers that Defendant had told her that Defendant was a participant in the offenses.

Sergeant Miller stated that he advised Defendant of her *Miranda* rights prior to the commencement of the interview, which included her right to remain silent, and her right to have an attorney present. Sergeant Miller said that Defendant initialed and signed the written waiver. Sergeant Miller said that Defendant appeared to understand her rights, and that she freely and voluntarily gave the statement that was reduced to writing.

On cross-examination, Sergeant Miller said that the arresting officers did not tell him that Defendant had said that she did not want to talk to anyone about the charged offenses. Sergeant Miller said that Defendant did not tell him that she wanted an attorney present. Sergeant Miller denied that he told Defendant she would able to go home if she gave a statement, that he made any promises in connection with the giving of a statement, or that he told Defendant what to say in her statement. In response to the trial court's question, Sergeant Miller stated that after the *Miranda* rights was read to her, Defendant asked "specifically if she had to answer all the questions and if she could stop when she wanted to." Sergeant Miller said that he told Defendant that she did not have to answer any question that she did not want to and that she could stop the interview at any point.

Defendant testified that she was arrested in Mississippi by the Greenville, Mississippi Police Department in connection with the current charges at approximately 6:50 a.m. Defendant said she immediately called her attorney in Tennessee who instructed her not to "talk to anybody." Defendant remained at the Greenville Police Department until approximately 4:00 p.m. when an extradition hearing was conducted. Defendant agreed to be extradited back to Tennessee. Defendant testified that she "told them I'd sign the papers, they can come and pick me up right then and there."

Defendant said two police officers from Tennessee arrived in Mississippi at approximately 7:00 p.m. to transport her to Tennessee. Defendant testified,

> [o]n the way here, I told them that – because my lawyer already told me don't talk to them or anybody. I told them that they could go ahead and take me to Jail East because I didn't want to talk to anybody, I was tired, and I really don't know what this is about. I was asking them what was it about. They told me they couldn't give me any information so I stopped talking to them.

Defendant said that she was taken to the Memphis Police Department on Poplar Avenue, arriving at approximately 10:00 p.m. Defendant asked why she was being taken to this location, and the arresting officers responded that she "had to talk to someone." Defendant said she was taken to an interview room where Sergeant Miller began talking with her. Defendant said that she told Sergeant Miller that she wanted to talk to a lawyer, but Sergeant Miller told her that a lawyer "couldn't really help" her because her three co-defendants had implicated her in the charged offenses. Defendant said that she gave an initial statement that had a different version of the sequence of events leading up the robbery and killing of the victim than that previously relayed by her co-defendants. Defendant said that Sergeant Miller told her that if she insisted on this version of her statement, her co-defendants would not be charged. Defendant said she then gave a second written statement under the direction of Sergeant Miller "which was totally different from what [she] had told him at first." Defendant said that she believed that if she cooperated, she would be allowed to return home. Defendant said that she did not read her second statement before she signed it and initialed each page.

On cross-examination, Defendant denied that she was read her *Miranda* rights prior to making her statement. She acknowledged that she executed a written waiver of her *Miranda* rights but stated that she did not read the document before signing it. Defendant acknowledged that she had been arrested several times prior to the current charges, and that she had been advised of her *Miranda* rights by the arresting officers on each prior occasion.

At the conclusion of the suppression hearing, Defendant argued that "it's the defense's position that once [Defendant] made known to any officer of the government that she was represented by counsel, that she should have been allowed to call that person, consult with him and that she should not have been questioned at all, and there should [not] have been any proceeding with questioning."

Based on the testimony presented at the suppression hearing, the trial court observed that the resolution of the matter was essentially a credibility issue. The trial court found that:

> [the trial court] has an individual, [Defendant], who has some experience with the system and has heard the waiver of rights before, does not appear to have an intellectual problem with understanding the rights and what those rights mean. And as advised at least on a couple of occasions that you have the right to have a lawyer, and you have a right to have your lawyer here, and you don't have to talk to us if you don't want to. You can stop any time you want to. And according to Sergeant Miller, she even asked him do I have to answer all of the questions, and he said, no you can stop any time you want to, that she at that point then is willing to converse with the officers. . . . Throughout all of that, it's obvious that [Defendant] was aware that she had a right to stop the conversation or stop the questioning, to talk with her lawyer. According to her, she had enough wherewithal, at least by her statement, when the officers came to Mississippi to detain her to call her lawyer here in Memphis and so it's obvious that she was well aware that she has a right to talk with a lawyer, and have a lawyer there with her and present, and she doesn't have to answer questions until her lawyer gets there.

The trial court specifically accredited Sergeant Miller's testimony, and discredited that of Defendant, finding no credible proof that Defendant requested the presence of her attorney during the interview or indicated that she did not wish to speak with the investigating officers without the presence of her attorney. The issue of an alleged violation of Defendant's constitutional right of silence was not argued before the trial court, and accordingly the trial court made no specific findings relevant to this issue, other than finding generally that Defendant was not credible.

Defendant did not challenge the trial court's denial of her motion to suppress in the motion for new trial filed on July 11, 2005. Argument at the motion hearing was limited to the three unrelated issues raised in Defendant's motion for new trial. The trial court denied Defendant's motion for a new trial on July 15, 2005. An order appointing new counsel was issued on July 18, 2005, and the trial court entered an order setting aside the first order denying Defendant's motion for new trial. Defendant thereafter filed amended motions for new trial on September 28, 2005, and November 7, 2005, in which Defendant argued for the first time that her statement was taken in violation of her constitutional right of silence pursuant to *Mosley*. Presumably a hearing was held on Defendant's amended motions for new trial, but no transcript of the hearing is included in the file. An order was entered denying Defendant's amended motion on November 7, 2005, without elaboration as to the specific findings of the trial court.

Based on the foregoing, we are of the opinion that Defendant has waived appellate consideration of this precise issue raised on appeal. First, a challenge to Defendant's statement based on a right of silence violation was not specifically raised in her motion to suppress or even later at the motion hearing. As a result, the trial court made no specific factual findings as to this issue. "A motion to suppress, like any other motion, is required to state the grounds upon which it

is predicated with particularity." *State v. Burton*, 751 S.W.2d 440, 445 (Tenn. Crim. App. 1988) (citing Tenn. R. Crim. P. 47. That is, the motion "'must be sufficiently definite, specific, detailed and non-conjectural, to enable the court to conclude a substantial claim . . . [is] presented.'" *Id*. (quoting *State v. Davidson*, 606 S.W.2d 293, 297 (Tenn. Crim. App. 1980)).

Second, although Defendant raised the issue in both of her amended motions for new trial, Defendant did not include a transcript of the hearing on her amended motions, and the record does not contain the trial court's reasoning in denying the amended motions.

"[A] party is not entitled to relief if the party invited error, waived an error, or failed to take whatever steps were reasonably available to cure an error." Tenn. R. App. P. 36(a), Advisory Commission Comments. Second, it is well settled that when a party seeks appellate review, there is a duty to prepare a record which conveys a fair, accurate and complete account of what transpired with respect to the issues forming the basis of the appeal. *See State v. Ballard*, 855 S.W.2d 557, 561 (Tenn.1993) (holding failure to include transcript precludes appellate review); *State v. Bunch*, 646 S.W.2d 158, 160 (Tenn.1983); *State v. Oody*, 823 S.W.2d 554, 559 (Tenn. Crim. App.1991) (holding trial court's ruling presumed correct in the absence of an adequate record on appeal). Where the record is incomplete and does not contain a transcript of the proceedings relevant to an issue presented for review, or portions of the record upon which the party relies, an appellate court is precluded from considering the issue. *See State v. Roberts*, 755 S.W.2d 833, 836 (Tenn. Crim. App.1988). Absent the necessary relevant material in the record to determine whether the principles of *Mosley v. Michigan* were violated as Defendant suggests, we decline to consider the merits of this issue. *See* Tenn. R. App. P. 24(b). Accordingly, the issue is waived.

## IV. Jury Instructions

### A. Facilitation Instruction

Defendant argues that the trial court's instruction to the jury on facilitation as a lesser included offense of the charged offenses impermissibly misled the jury. The trial court charged the jury as follows:

> Any person who commits the offense of facilitation of a felony is guilty of a crime.
>
> For you to find the defendant guilty of this offense, the State must have proven beyond a reasonable doubt the existence of the following essential elements:
>
> (1) that the defendant knew that another person intended to commit a specific felony but did not have the intent to promote or assist the commission of the offense or to benefit in the proceeds or results of the offense;
>
> and

(2) that the defendant furnished substantial assistance to that
person in the commission of the felony;

and

(3) that the defendant furnished such assistance knowingly.

Defendant argues that by failing to define the offense of facilitation in terms of a specific offense, the jury was left without a reference point with which to consider the instruction. Moreover, Defendant contends that the facilitation instruction was not provided until after the charged offenses, and their lesser included offenses, had been defined and was thus presented to the jury out of context.

In criminal cases, a defendant has a right to a correct and complete charge of the law. *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000). The failure to do so deprives the defendant of the constitutional right to a jury trial and subjects the erroneous jury instruction to harmless error analysis. *Id*.at 433-34. A jury instruction is considered "prejudicially erroneous if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." *State v. Hodges*,944 S.W.2d 346, 352 (Tenn.1997).

In evaluating claims of error in the jury charge, this court must review the charge in its entirety and read it as a whole. *State v. Leach*, 148 S.W.3d 42, 58 (Tenn. 2004). The trial court specifically charged the jury that the charged offense of first degree felony murder included the lesser included offense of facilitation of first degree felony murder, and that included within the charged offense of especially aggravated robbery are the lesser included offenses of aggravated robbery, robbery, aggravated assault, reckless aggravated assault and "facilitation of all of the above." These options were also included in the written verdict form provided to the jury.

Based on our review of the jury instructions in their entirety, we cannot conclude that the instructions failed to fairly submit the legal issues or misled the jury as to the applicable law. Defendant is not entitled to relief on this issue.

B. Criminal Attempt

Relying on *State v. Burns*, 6 S.W.3d 453 (Tenn. 1999), Defendant argues that the trial court erred in failing to instruct the jury on criminal attempt as a lesser included offense of especially aggravated robbery. In *Burns*, our Supreme Court concluded that an attempt to commit the charged offense is a lesser included offense of the charged offense. *Id*. at 467. At the time of Defendant's trial, however, absent a written request for an instruction on a lesser included offense the failure of the trial court to instruct the jury on the lesser included offense is not available as a ground for relief either in a motion for new trial or on appeal. T.C.A. § 40-18-110(c) (2005). Because Defendant failed to file a written request asking the trial court to instruct the jury on the lesser included offense of attempted especially aggravated robbery, this issue is waived on appeal unless it rises to the level of plain error. *State v. Page*, 184 S.W.3d 223, 226 (Tenn. 2006).

-10-

When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of an accused at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal. *See also* Tenn. R. App. P. 36(b). The factors to be considered when deciding whether an error constitutes "plain error" in the trial are: "'(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is necessary to do "substantial justice."'" *State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). In order for this court to reverse the judgment of a trial court, the error must be "of such a great magnitude that it probably changed the outcome of the [proceedings]," and "recognition should be limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial." *Adkisson*, 899 S.W.2d at 642.

If an offense is a lesser included offenses, as here, under part (c) of the *Burns* analysis, the next question is whether the evidence presented at Defendant's trial justified a jury instruction on attempted especially aggravated robbery. This analysis requires two steps. First, the trial court "must determine whether any evidence exists that reasonable minds could accept as to the lesser included offense, viewing the evidence liberally in the light most favorable to the lesser included offense." *State v. Marcum*, 109 S.W.3d 300, 302 (Tenn. 2003) (citing *Burns*, 6 S.W.3d at 469). Then, the trial court "must determine whether the evidence, viewed in this light is legally sufficient to support a conviction for the lesser included offenses." *Id*. at 303. "Further, part (c) of the *Burns* test, which makes an attempt a lesser included offense, applies 'to situations in which a defendant attempts to commit . . . either the crime charged, or a lesser included offense, but no proof exists of the completion of the crime.'" *Id*. (quoting *State v. Ely*, 48 S.W.3d 710, 719 (Tenn. 2001)).

With these principles in mind, Defendant acknowledged that she was the one who initiated the meeting with the victim on the night of the offense, that she joined Mr. Thacker and Mr. Epps in subduing the victim by striking him with a beer bottle and a hammer, that she observed Mr. Epps and Ms. Gates removing the victim's belongings from the house while the victim was subdued, and that she took three of the victim's beers with her when she left. Dr. Smith's testimony corroborated the presence of injuries on the victim consistent with being struck with a hammer and a beer bottle. Ms. Crayton corroborated Defendant's testimony that the group stole certain items belonging to the victim, and testified that Mr. Thacker later attempted to sell the victim's property. In her trial testimony, Defendant did not deny that the victim was robbed, but argued instead that her conduct did not rise to the level of criminal responsibility for the conduct of her co-defendants. Based on our review, we conclude that the trial court's failure to instruct the jury on attempted especially aggravated robbery was not error. Accordingly, because we find no error, Defendant has failed to establish that a substantial right has been adversely affected by the admission of this testimony. This precludes the presence of "plain error." *Adkisson*, 899 S.W.2d at 639. Defendant is not entitled to relief on this issue.

## C. Pattern Instruction 43.04

Defendant challenges the constitutionality of Tennessee Pattern Instruction, Criminal 43.04. The trial court, paraphrasing this pattern instruction, charged the jury that "the jury in no case should have any sympathy or prejudice or allow anything but the law and the evidence to have any influence upon them in determining their verdict." *See* T.P.I. 43.04 ("You can have no prejudice or sympathy, or allow anything but the law and the evidence to have any influence upon your verdict.") Defendant argues that the pattern instruction's mandatory language conflicts with pattern instructions 1.02, "[t]he law applicable to this case is stated in these instructions, and it is your duty to carefully consider them;" 1.06, '[n]either by such rulings, these instructions, nor any such remarks which [the trial court has made does the trial court] mean to indicate any opinion as to the facts or as to what your verdict should be; and 1.08, "[y]ou should apply the law to the facts in deciding this case." In other words, Defendant contends that nowhere in the pattern instructions other than in instruction 43.04 is the jury instructed that it "must" follow the law or that it "must apply" the law as given by the trial court.

"It is the duty of a trial judge to give a complete charge of the law applicable to the facts of a case." *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986) (citing *State v. Thompson*, 519 S.W.2d 789, 792 (Tenn. 1975)). In other words, "a defendant has a constitutional right to a correct and complete charge of the law." *State v. Teel*, 793 S.W.2d 236, 249 (Tenn.1990). "While the jury is the judge of the facts and the law, it is the duty of the jury to apply the law contained in the charge of the trial court to the ultimate facts determined by the jury." *State v. Williamson*, 919 S.W.2d 69, 80 (Tenn. Crim. App.1995).

Defendant's issue has been previously addressed by a panel of this Court. *See State v. Jerome Bond*, No. W2004-02557-CCA-R3-CD, 2005 WL 3343803, *4 (Tenn. Crim. App., at Jackson, Dec. 8, 2005), *perm. to appeal denied* (Tenn. Apr. 24, 2006) (concluding that pattern instruction 43.04 "comports with the law," and the other instructions "are not so contradictory as to have confused the jury or otherwise to have mitigated their function as fact-finder"). Moreover, our supreme court has concluded that "[a] trial judge does not err in instructing a jury not to allow mere sympathy or prejudice to influence them in reaching their verdict." *State v. Smith*, 893 S.W.2d 908, 921 (Tenn. 1994) (citations omitted). Our supreme court has "on numerous occasions upheld the 'no-sympathy' instruction against constitutional attack." *State v. Bigbee*, 885 S.W.2d 797, 814 (Tenn. 1994) (citing *State v. Cazes*, 875 S.W.2d 253, 268 (Tenn. 1994); *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992)).

Based on the foregoing, we conclude that Defendant is not entitled to relief on this issue.

## CONCLUSION

After a thorough review, we affirm the judgments of the trial court.

_____
THOMAS T. WOODALL, JUDGE

-12-